F I L E D
United States Court of Appeals
Tenth Circuit

JUL 8 1997

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

    v.

GUSTAVO MENDEZ,

      Defendant - Appellant.

No. 96-1453

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 96-CR-74-M)

Submitted on the briefs:

Michael G. Katz, Federal Public Defender, Warren R. Williamson, Assistant Federal Public Defender, Audrey Baker, Research & Writing Specialist, Denver, Colorado, for Defendant-Appellant.

Henry L. Solano, United States Attorney, John M. Hutchins, Assistant United States Attorney, Denver, Colorado, for Plaintiff-Appellee.

Before **ANDERSON**, **HENRY**, and **BRISCOE**, Circuit Judges.

**ANDERSON**, Circuit Judge.

Defendant Gustavo Mendez, convicted and sentenced for possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), appeals the denial of his motion to suppress evidence. We affirm.[*]

## I.

On February 17, 1996, Colorado State Patrol Trooper Thomas Iovinella was driving in a marked patrol car on Highway 160, west of Del Norte, Colorado. At 2:20 p.m., Iovinella stopped a Chevrolet Malibu, driven by Mendez, for speeding. As Iovinella approached the driver's side of the car, he noticed that a plastic "faceplate" on the dashboard appeared crooked and that the car's radio was "crooked and just kind of laying in [the console]." R. Vol. 4, at 10. Iovinella explained to Mendez the reason for the stop, and informed Mendez he would issue a warning for speeding. Iovinella requested Mendez's driver's license, registration, and proof of insurance. Mendez produced a California driver's license in his name, and an Arizona registration in another person's name. Iovinella inquired regarding ownership of the vehicle, and Mendez responded that the car belonged to his sister's husband.

---

[*]After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

Iovinella asked Mendez where he was headed, and Mendez replied that he was headed to Colorado Springs to visit his sister. Iovinella asked Mendez where his sister lived in Colorado Springs. Mendez said that he did not know the address, but knew how to get there. Iovinella then returned to his patrol car to conduct a computer check on Mendez's license and registration, as well as on the vehicle plates. All the checks came back clear, with "no wants or warrants." Id. at 11.

When Iovinella returned to Mendez's car, he again pressed Mendez regarding whether he knew the location of his sister's house. Iovinella also asked Mendez whether he was "carrying any drugs, large sums of money, weapons or explosives." Id. at 12-13. When Mendez denied carrying any contraband, Iovinella asked for, and obtained, Mendez's oral consent to search the car. Iovinella told Mendez that he appreciated his cooperation, and explained that he needed Mendez to sign a written consent form. Iovinella then returned to his patrol car, radioed for backup, and prepared the consent form.

Trooper Dingfelter, the backup, arrived eight to ten minutes later. Iovinella asked Mendez to step out of his car and stand by Dingfelter. Iovinella then showed Mendez the consent form, and asked him to read and sign it. Mendez signed the form.

When Iovinella entered Mendez's car to commence the search, he smelled marijuana. He found a jacket in the back seat and handed it to Dingfelter. While Iovinella continued searching the car, Dingfelter looked through the pockets of the jacket

and discovered marijuana. Dingfelter arrested Mendez and placed him in the back of the patrol car. Dingfelter then assisted Iovinella in searching Mendez's car.

The officers noticed that some screws were missing from the car's dashboard. The officers removed a few more screws and pulled off the dashboard's faceplate. Dingfelter reached into the vehicle's air vent, and pulled out two balls wrapped in black duct tape. He cut one open and discovered a substance later confirmed to be methamphetamine.

Mendez was indicted on March 4, 1996, in the District of Colorado, on one count of possession of methamphetamine with intent to distribute. He filed a motion to suppress evidence and statements on April 15, 1996. The district court denied the motion on May 20, 1996, finding that Mendez's consent to search the vehicle was voluntary. Mendez entered a plea of guilty on July 5, 1996, conditioned on his right to appeal the denial of his motion to suppress. Mendez was sentenced to forty-six months' imprisonment, four years' supervised release, and a $50 special assessment. Following sentencing, this appeal ensued.

## II.

On appeal, Mendez argues that Iovinella's questioning regarding contraband and consent to search was "outside the scope of the original reason for the traffic stop, and was not based on a reasonable suspicion that appellant was involved in criminal activity." Appellant's Br. at 6. Mendez requests that we reverse the district court's denial of his

motion to suppress, and remand the case in order for the district court to make more specific findings regarding whether Iovinella had returned Mendez's driver's license and registration prior to requesting consent to search the vehicle. Mendez argues that if Iovinella asked for consent to search before returning the documentation, then the consent was obtained as the result of an illegal detention.

"When reviewing the denial of a motion to suppress evidence, we view the evidence in the light most favorable to the government and the district court's findings, and we review the district court's factual findings only for clear error." United States v. Anderson, ___ F.3d ___, 1997 WL 287031, at *3 (10th Cir. May 30, 1997). We review de novo the district court's ultimate determination of reasonableness under the Fourth Amendment. Id.

A routine traffic stop is a seizure under the Fourth Amendment. United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995) (en banc), cert. denied, 116 S. Ct. 2529 (1996). Governed by the principles of Terry v. Ohio, 392 U.S. 1 (1968), a traffic stop "must be justified at its inception and the detention must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" Anderson, 1997 WL 287031, at *4 (quoting Terry, 392 U.S. at 20). In this case, there is no dispute that Mendez's speeding justified the initial stop. Therefore, we turn to whether "the investigative detention exceeded permissible Fourth Amendment bounds." Id.

An officer conducting a routine traffic stop may run computer checks on the driver's license, the vehicle registration papers, and on whether the driver has any outstanding warrants or the vehicle has been reported stolen. Id.; United States v. Elliot, 107 F.3d 810, 813 (10th Cir. 1997); United States v. McRae, 81 F.3d 1528, 1535 n.6 (10th Cir. 1996). However, once the computer checks confirm that the driver has produced a valid license and proof of entitlement to operate the car, the driver must be permitted to proceed on his way, without further delay by police for additional questioning. Anderson, 1997 WL 287031, at *4; Elliot, 107 F.3d at 813. Further questioning is permissible only if (1) "the encounter between the officer and the driver ceases to be a detention, but becomes consensual, and the driver voluntarily consents to additional questioning," Anderson, 1997 WL 287031, at *4, or (2) during the traffic stop the officer gains a reasonable and articulable suspicion that the driver is engaged in illegal activity. Id.; Elliot, 107 F.3d at 813.

A.    **Consensual Encounter**

In this case, Iovinella checked--and cleared--Mendez's documentation, and issued Mendez a warning for speeding. Iovinella then proceeded to ask Mendez whether he was carrying contraband, and whether he would consent to a search of his vehicle. The district court found that these additional questions "would not be relevant to the reason for the stop." R. Vol. 4 at 86. The government does not dispute this finding, but argues

that the additional questions were justified by the consensual nature of the prolonged encounter. Specifically, the government contends that once Iovinella returned Mendez's documentation and thanked him for his cooperation, "one would infer a closure to the detention." Appellee's Br. at 13.

While determining whether an officer and driver are engaged in a consensual encounter typically requires the court to focus on the totality of the circumstances in a particular case, this circuit has consistently applied at least one bright-line rule: an officer must return a driver's documentation before the detention can end. Anderson, 1997 WL 287031, at *5; Elliot, 107 F.3d at 814; McRae, 81 F.3d at 1534 n.3; United States v. Gregory, 79 F.3d 973, 979 (10th Cir. 1996); United States v. Sandoval, 29 F.3d 537, 540 (10th Cir. 1994) ("no 'reasonable person' would feel free to leave without such documentation"); United States v. McKneely, 6 F.3d 1447, 1451 (10th Cir. 1993) (noting "the clear line historically drawn between police-citizen encounters which occur before and after an officer returns a person's driver's license, car registration, or other documentation"). At the suppression hearing, Mendez raised the issue of whether Iovinella returned his driver's license and registration before or after asking questions unrelated to the stop. Iovinella testified that he returned the documentation immediately after the computer checks came back clear, and before any additional questioning. R. Vol. 4, at 12, 28, 39. Defense counsel noted, however, that the written consent form signed by Mendez included the vehicle identification number of Mendez's car. Counsel

suggested during cross-examination that Iovinella must have still had the registration at the time he prepared the form. Iovinella admitted that he wrote the vehicle identification number on the form after asking Mendez for oral consent, but he claimed he obtained the number from the dispatcher, rather than from the vehicle registration.[1] Id. at 37.

In its oral ruling denying Mendez's motion to suppress, the district court stated:

> There has been this question raised as to how [Iovinella] got the vehicle identification number [at the time he filled out the written consent form]. His response was that he obtained it from the dispatcher. There's some question about that as to whether the officer still had the registration form at that time and had not returned it, as he testified, that is, returned it before he asked the question about contraband and asked for the oral consent to search. I don't find that to be a significant issue in the case.

Id. at 84. The district court did not consider this a significant issue because it believed the rule requiring the return of documentation prior to additional questioning applied principally to cases where there is "an ambiguity with respect to the [oral] consent." Id. at 87. Finding that there was no question Mendez understood the written consent form, and that there was a ten minute delay between the oral and written consents during which Mendez could have reconsidered, the district court concluded the consent was voluntary, and that a "substantially contemporaneous[]" return of Mendez's documentation was sufficient. Id. at 86-88.

---

[1]Investigator McGinniss, who also testified at the suppression hearing, confirmed that officers can, and sometimes do, obtain vehicle identification numbers from dispatch. R. Vol. 4, at 76-77. When asked by defense counsel how such information is normally obtained, however, McGinniss testified it is normally obtained from the registration or the car itself. Id. at 66.

Having reviewed the district court's entire oral ruling, we agree with Mendez that the district court did not make sufficient findings regarding whether Iovinella returned Mendez's documentation before, or after, the additional questioning. Without knowing the point at which Iovinella returned Mendez's documents, we cannot determine the earliest point at which the encounter *could* have become consensual. See Elliot, 107 F.3d at 814 (return of documentation is a necessary, but not always sufficient, condition of a consensual traffic-stop encounter). Contrary to Mendez's arguments, however, this does not necessarily require a remand. The additional questioning was justified if, during the traffic stop, Iovinella gained a reasonable and articulable suspicion that Mendez was engaged in illegal activity. Anderson, 1997 WL 287031, at *4.

B. **Reasonable and Articulable Suspicion**[2]

The government relies upon the following as providing Iovinella with reasonable and articulable suspicion: Mendez told Iovinella that the car, which was registered in Arizona, belonged to his sister's husband, yet he was headed to visit his sister in Colorado Springs; Mendez did not know his sister's address; there was no luggage in the back seat;

---

[2]The district court did not rule upon the issue of reasonable and articulable suspicion. Yet, neither Mendez nor the government mentions this point, and each party argues the issue on appeal. "[B]ecause the proceedings below resulted in a record of amply sufficient detail and depth from which the determination may be made," we resolve the issue. United States v. McSwain, 29 F.3d 558, 562 (10th Cir. 1994) (citation omitted); see also McRae, 81 F.3d at 1532 n.1.

and the dashboard's faceplate "wasn't quite straight and looked as if it had been repaired or replaced," Appellee's Br. at 16, and the radio was loose in the console. When evaluating these factors, we judge the officer's conduct in light of common sense and ordinary human experience. McRae, 81 F.3d at 1534. "Our task . . . is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious," United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir. 1994), but rather to determine whether the totality of the circumstances justify the detention. McRae, 81 F.3d at 1534. We make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances, id., remembering that reasonable suspicion represents a "minimum level of objective justification" which is "considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Sokolow, 490 U.S. 1, 7 (1989) (citation omitted).

Initially, we discount Iovinella's reliance on the lack of luggage on the vehicle's back seat. Although activities entirely consistent with innocent travel can, and frequently do, contribute to reasonable suspicion, id. at 9, some facts are so innocuous and "so susceptible to varying interpretations" that they carry little or no weight. United States v. Lee, 73 F.3d 1034, 1039 (10th Cir. 1996). The vehicle Mendez was driving has a trunk, a

location in which many, if not most, travelers store luggage.  In this instance, we find only the most minute significance in the fact that Mendez had no luggage on the back seat.[3]

We hold, however, that the remaining factors provided Iovinella with reasonable suspicion permitting him to ask Mendez whether he was carrying contraband and whether he would consent to a search of his vehicle.  First, contradictory or implausible travel plans can contribute to a reasonable suspicion of illegal activity.  McRae, 81 F.3d at 1535 (driver claimed to be headed to New York in a rental car due back in Los Angeles in two days); United States v. Kopp, 45 F.3d 1450, 1453-54 (10th Cir.) (defendant said he was driving from California to North Carolina to deliver a "very dilapidated sofa to some friends" and was vague about his actual destination), cert. denied, 115 S. Ct. 1721 (1995); United States v. Sanchez-Valderuten, 11 F.3d 985, 989 (10th Cir. 1993).  Here, Mendez said that his sister lived in Colorado Springs, but claimed that the car, which was registered in Arizona, belonged to his sister's husband.  Furthermore, Mendez could not tell Iovinella his sister's address in Colorado Springs.[4]  Although neither of these factors,

---

[3]Of course, we might view a lack of luggage in a vehicle's passenger compartment much differently if the driver claimed to be making a lengthy trip and the vehicle did not have a trunk.

[4]With respect to his travel plans, Mendez first told Iovinella that he did not know his sister's address, but knew how to get there.  At some later point, Iovinella asked Mendez what part of town his sister lived in, and Mendez did not know.  There is some dispute over whether the later question was asked before or after Iovinella cleared Mendez's documents and issued the citation.  For purposes of determining reasonable suspicion, we have considered only Mendez's initial statement that he did not know the address, but knew how to get there.

when viewed individually, is manifestly suspicious, both could properly contribute to a reasonable suspicion in an experienced officer.

Second, Iovinella, a six-year veteran, observed a crooked dashboard faceplate and dismounted radio. These observations also could contribute to an experienced law enforcement officer's reasonable suspicion of illegal activity. "[A]n experienced law enforcement officer would know that drug couriers do not often leave their contraband 'strewn across the trunk or floor of a car,' and that they frequently hide drugs . . . inside the cavities in a car's panels." United States v. Chaidez, 906 F.2d 377, 384 (8th Cir. 1990) (quoting United States v. Ross, 456 U.S. 798, 820 (1982)). Disassembled interiors, scratched paint, missing screws or other signs that a vehicle's paneling or natural configuration has been altered often lead law enforcement officers to the discovery of contraband. See, e.g., Anderson, 1997 WL 287031, at *2 (where observation of "fresh tool marks on the gas tank" led to the discovery of a drug-filled compartment in the gas tank); United States v. Pena, 920 F.2d 1509, 1512 (10th Cir. 1990) (where "loose, crooked and missing screws on the interior molding" led officer to discover cocaine in the quarter panel); United States v. Olivier-Becerril, 861 F.2d 424, 425 (5th Cir. 1988) (where presence of bondo and glued-down carpeting led to discovery of cocaine under trunk's carpeting); United States v. Espinosa, 782 F.2d 888, 892 (10th Cir. 1986) (drugs found behind loose quarter panel); United States v. Lopez, 777 F.2d 543, 546 (10th Cir. 1985) (drugs found behind stereo speakers). Hence, we hold that Iovinella's observations

of the dislocated dash and dismounted radio, along with Mendez's vague travel plans, provided Iovinella with reasonable suspicion, and justified the brief detention of Mendez following his traffic stop.

## C.      The Validity of Mendez's Consent

Having concluded that Iovinella lawfully detained Mendez during the brief period in which he asked Mendez whether he was carrying contraband and whether he would consent to a search of the vehicle, the only remaining question is whether Mendez's subsequent consent was voluntary. A person who is being detained may give a voluntary consent to search. McRae, 81 F.3d at 1537. In determining voluntariness, we consider whether the consent was "unequivocal and specific and freely and intelligently given," and whether it was given without duress or coercion. United States v. Angulo-Fernandez, 53 F.3d 1177, 1180 (10th Cir. 1995) (quoting United States v. Dewitt, 946 F.2d 1497, 1500 (10th Cir. 1991)). On appeal, Mendez's contention that his consent was involuntary is entirely dependent upon his argument that he gave the consent during an illegal detention. He does not make any argument that his consent was involuntary even if obtained during a lawful detention. We have, however, reviewed the circumstances of Mendez's consent, and find no signs of coercion or duress, and no reason to doubt its specificity or that it was freely given. Accordingly, we conclude that the search was legal and that the district court correctly denied Mendez's motion to suppress.

**III.**

For the foregoing reasons, we AFFIRM the denial of Mendez's motion to suppress.