**UNITED STATES of America,
Plaintiff,**

v.

**Ralph M. GARRETT and David
R. Mallard, Defendants.**

No. 98–40109–01/02–SAC.

United States District Court,
D. Kansas.

March 18, 1999.

Thomas G. Luedke, Office of United States Attorney, Topeka, KS, plaintiff pro se.

James G. Chappas, Jr., Topeka, KS, for plaintiff.

Ralph M Garrett, Dallas, TX, defendant pro se.

David R Mallard, Dallas, TX, defendant pro se.

David J. Phillips, Office of Federal Public Defender, Topeka, KS, defendant pro se.

Marilyn M. Trubey, Office of Federal Public Defender, Topeka, KS, defendant pro se.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This controlled substance case comes before the court on the defendants' following pretrial motions: Garrett's motion for disclosure of 404(b) evidence (Dk.30); Garrett's motion to suppress evidence (Dk.31); and Mallard's motion to adopt and join Garrett's motions (Dk.34). The government has filed a consolidated response. (Dk.35). The parties presented arguments and evidence on February 25, 1999, at 10:00 a.m. Having heard those matters and reviewed the written submissions, the court issues the following as its ruling on the defendants' motions.

### INDICTMENT

The grand jury returned a two-count indictment on November 19, 1998, charging the defendants with: (1) possession with the intent to distribute in excess of 500 grams of a substance containing a detectable amount of cocaine hydrochloride in violation of 21 U.S.C. § 841(a)(1); and (2) conspiracy to possess with the intent to distribute in excess of 500 grams of a substance containing a detectable amount of cocaine hydrochloride in violation of 21 U.S.C. § 846. Both counts allege the offenses to have occurred on October 10, 1998, in the District of Kansas.

### MALLARD'S MOTION TO ADOPT AND JOIN (DK.34)

The court grants this motion subject to the conditions set out in the court's Criminal Procedural Guidelines at paragraph I(F):

A motion to join another party's motion will be granted only upon the following conditions. The joining party will not be allowed to raise any legal or factual arguments that are additional to or different from those found in the original motion, unless they are advanced in the motion to join. Issues, such as prejudice, standing, fairness, or need, that are unique to the party seeking to join must be made in the written motion to join or

the court will deem them to have been waived.

The defendant Mallard's motion to join does not advance any additional arguments or address any issues unique to him.

## MOTION FOR DISCLOSURE OF 404(B) EVIDENCE (DK.30)

The defendants seek an order requiring the government to disclose any prior convictions or other crimes, wrongs or acts by them which the government intends to introduce into evidence at trial pursuant to Fed.R.Evid. 404(b). In its brief, the government responded "that the general nature of prior bad acts that it might offer under this rule include prior conduct involving the distribution and possession of controlled substances." (Dk.35, p. 10). At the hearing, the government's counsel said he did not have any Rule 404(b) evidence to offer at trial and that he did not anticipate receiving any. If such evidence was later obtained and intended for use at trial, the government's counsel represented he would turn it over immediately. Having heard the government's representations, the court denies the defendants' motion as moot.

## MOTION TO SUPPRESS EVIDENCE (DK.31)

The defendants seek to suppress from evidence all items seized and any statements attributed to them during and following the stop on October 10, 1998. The defendants maintain all evidence seized and any subsequent statements are the fruit of an illegal detention. The government responds that the detention was at all times lawful and that the search was done only after voluntary consent was received.

### Facts

From the evidence presented at the hearing, the court finds the relevant facts to be as follows. On Saturday, October 10, 1998, Trooper Jim Brockman was patrolling Kansas Turnpike on Interstate 35 in Lyon County. Kansas. He has worked with Kansas Highway Patrol for over sixteen years. His duties that day were to patrol the Kansas Turnpike and to work as a canine handler assigned to the criminal interdiction unit. His shift began around 2:00 a.m., and he pulled over a 1989 Chevrolet pickup around 6:07 a.m. for speeding.

Trooper Brockman approached the stopped pickup, identified himself, and asked to see a driver's license. He then informed the driver that the reason for the stop was that the radar unit had first checked the pickup's speed at 76 miles per hour and had locked onto a speed of 75 miles per hour. The driver, Ralph M. Garrett, provided a Texas driver's license and stated that the pick-up was owned by the passenger, who was later identified to be David R. Mallard. Pursuant to the Trooper's request, Mr. Mallard provided documentary proof of insurance. Trooper Brockman then asked Mr. Garrett to accompany him back to the patrol car while he wrote the warning citation.

Trooper Brockman engaged Mr. Garrett in conversation during the citation process and license check. Mr. Garrett told the Trooper that they were going to Kansas City for a wedding. Trooper Brockman asked who was getting married, and Mr. Garrett answered it "was a friend of ours." Upon learning from the dispatcher that Garrett's license had been suspended for failure to have insurance, Trooper Brockman questioned Mr. Garrett about this, and Mr. Garrett admitted knowing the license was suspended and explained he was driving only because Mr. Mallard had become tired. Mr. Garrett also told the Trooper that the wedding was to occur that very afternoon around 1:00 p.m. and mentioned something about being late and wanting to get situated. Trooper Brockman then asked Mr. Garrett for the name of the person getting married. After pausing for several seconds, Mr. Garrett said the person was really Mr. Mallard's friend and that he was only along for the ride. Mr. Garrett was never able to identify by name the person getting married.

Around 6:13 a.m., Trooper Brockman returned to the pickup and asked for Mr.

Mallard's driver's license upon informing him that Mr. Garrett's license was suspended. Trooper Brockman inquired about where they were headed, and Mr. Mallard said they were going to "Columbia, Missouri" for a wedding. Mr. Mallard first said the wedding was for "a friend of ours" and then added a "friend of mine named Jeff Sanders." Mr. Mallard told the Trooper the wedding was tomorrow or Sunday "about twelve." At this point, Trooper Brockman asked Mr. Mallard if there were any weapons in the car, and Mr. Mallard said, "No."

Around 6:14 a.m., Trooper Brockman walked back to his patrol car and radioed in the information on Mr. Mallard's driver's license. Trooper Brockman repeated his question to Mr. Garrett on the "whereabouts of the wedding." Mr. Garrett again answered, "Kansas City," and admitted to not knowing the person's name but to having met the groom on one occasion. The dispatcher responded with information on Mr. Mallard's license, and Trooper Brockman then requested a criminal history or Triple I check on both Mr. Mallard and Mr. Garrett.

While waiting for a report back on the criminal history check, Trooper Brockman asked Mr. Garrett if there were any weapons in the truck or on him. Mr. Garrett answered, "No," and offered that he was not a violent person. Trooper Brockman next asked Mr. Garrett if he had ever been arrested. The Trooper testified that he asked this question to determine if Mr. Garrett had any prior criminal activity which would indicate that he would not appear for the driving with the suspended license citation. The Trooper explained that if he had concerns about Garrett's later appearance, then he would have taken Garrett into custody and required Garrett to post a bond. Mr. Garrett told the Trooper that he had been arrested twice, once for assault during a family dispute and once when a companion had possessed a firearm.

In response to Trooper Brockman's question, Mr. Garrett said that he had

known David since 1986 or 1987, or about twelve years. Trooper Brockman inquired whether Mr. Garrett knew of any warrants against him, and Garrett answered, "No." In response to another question, Mr. Garrett said he worked in a wholesale warehouse and clarified that his job did not require driving a vehicle other than a forklift. Trooper Brockman then handed the driver's license and citation to Mr. Garrett and explained that the citation being issued was for driving with a suspended license, that this was an "arrestable offense," but that he was not going to arrest him.

Trooper Brockman asked Mr. Garrett if he would mind answering a few more questions, and Mr. Garrett said he would not. Trooper Brockman pointed out there was some confusion between Mr. Garrett and Mr. Mallard on where they were going. At this point, the dispatcher radioed back with the Triple I report that Mr. Garrett had a prior narcotics arrest. Trooper Brockman asked Mr. Garrett why he had not disclosed this prior arrest, and he responded that someone had used his name as an alias when arrested on drug charges. Trooper Brockman then inquired if there were any drugs in the pickup, and Mr. Garrett said there were none. Trooper Brockman reiterated the conflicting travel stories, and Mr. Garrett adamantly responded that they were headed for Kansas City and that he could "verify that."

At approximately 6:23 a.m., Trooper Brockman went back to the pickup where Mr. Mallard was sitting. He returned the driver's license and said that he was done with the traffic stop but that there were some other things about which he would like to ask Mr. Mallard some questions. Mr. Mallard said, "alright." Mr. Mallard told the Trooper that Mr. Garrett was a "real good friend" who he had known for about five years and who was along just to help with the driving. Mr. Mallard said he did not know anything about Mr. Garrett's prior arrests for guns and drugs. Mr.

Mallard responded that he had told Mr. Garrett where and when the wedding was to be held. Around 6:25 a.m., Trooper Brockman explained to Mr. Mallard his concern over the conflicting trip stories and Mr. Garrett's prior criminal activity and asked Mr. Mallard for permission to search the pickup for drugs or weapons. Mr. Mallard answered, "yes, that would be alright." While waiting for another officer to arrive before conducting the search, Trooper Brockman asked Mr. Mallard if he knew where Mr. Garrett worked. Mallard said Garrett was presently unemployed but that he worked for a temporary service.

Trooper Brockman then walked back to his patrol car and told Mr. Garrett that Mr. Mallard had given permission for him to search the pickup. Mr. Garrett said he had no problem with that as he was just along for the ride. Trooper Brockman requested Mr. Mallard to step outside the car for a patdown for guns. Trooper Brockman found a pager, but no weapon. He then returned to Mr. Mallard and after a quick pat down asked Mr. Mallard to go back and stand with Mr. Garrett. Trooper Brockman commenced his search around 6:31 a.m. and approximately fifteen minutes later he announced to the other Trooper on the scene to arrest the defendants as he had found a secret compartment behind the seat with a bundle in it.

Trooper Brockman testified to the different indicators on which he based his suspicion of criminal activity occurring. First, the pickup was coming from Texas. In his experience and training, Texas is a source state, that is, a state from which narcotics are frequently transported, and couriers move the drugs northward from one of the border states. Brockman testified that he has never been involved in a large drug seizure where drugs were being transported from the north to the south.

Second, the pickup was stopped prior to 11:00 a.m. Trooper Brockman said his most significant drug trafficking seizures have occurred prior to 11:00 a.m. He opined that couriers want to travel while it is dark through those states, like Texas, that emphasize criminal interdiction, because they know there are generally fewer officers patrolling between midnight and 6:00 a.m.

Third, Mr. Mallard and Mr. Garrett gave conflicting and implausible stories about their trip. Though ostensibly headed for the same wedding, they gave different locations, dates and times for the wedding. The discrepancies were substantial, such as whether the wedding was today or tomorrow and whether it was in Kansas City or Columbia. Both initially said that a mutual friend was getting married and then changed the story to say that the groom was only Mr. Mallard's friend. Finally, Mr. Garrett did not know the name of the friend getting married. Trooper Brockman found it hard to believe that someone would make a cross-country trip for a wedding and not even know the name of the person getting married. Trooper Brockman testified that in every traffic stop with multiple occupants where he found drugs, he also had the indicator of inconsistent stories. In this case, Mr. Mallard and Mr. Garrett also gave conflicting accounts for how long they had known each other and whether Mr. Garrett was employed.

Fourth, Mr. Garrett displayed abnormal nervous behavior that went "far beyond just the normal traffic stop." Trooper Brockman testified that Mr. Garrett kept moving around in his seat in the patrol car, would slump over as if going to sleep, and then suddenly sit up. Mr. Garrett used exaggerated hand motions while he talked. The Trooper observed that Mr. Garrett initially acted "a lot more nervous" than someone getting a warning for speeding. Even after telling Mr. Garrett that he would not be arrested for driving with a suspended license, Brockman noticed that Garrett was "still very fidgety." Based on his more than sixteen years with the Kansas Highway Patrol, Trooper Brockman testified that in probably less than five percent of his traffic stops does he detect

abnormal nervous behavior. It has been this Trooper's experience that when a person exhibits more than what he believes to be reasonable nervousness, there is usually a reason behind it, such as an invalid driver's license, an outstanding warrant, or other criminal activity occurring. Trooper Brockman further testified to the training he had received for identifying unusual nervous behavior as an indicator.

Fifth, Mr. Garrett had prior arrests for weapons and narcotics. Trooper Brockman testified that the arrests demonstrate prior involvement in drug activity. He also said that a "large number" of his prior drug seizures involved persons who had engaged in "prior drug activity." In deciding whether to arrest Mr. Garrett for driving with a suspended license, Trooper Brockman asked Mr. Garrett if he had any prior arrests. Mr. Garrett did not reveal his prior narcotics arrest and then blamed someone else for the arrest when the Trooper subsequently learned about it.

**Governing Law**

■ The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV; *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89, 95 (1996). Because the temporary stop of an automobile is considered a seizure of "persons," it must not be "unreasonable." *Id.* The stop is "reasonable" if the law enforcement officer has "probable cause to believe that a traffic violation has occurred." *Whren,* 517 U.S. at 810, 116 S.Ct. at 1772, 135 L.Ed.2d at 95 (citations omitted). The officer has probable cause to arrest if he knows facts "that would 'warrant a [person] of reasonable caution in the belief that an offense has been or is being committed.'" *United States v. Bruce,* 78 F.3d 1506, 1508 (10th Cir.), *cert. denied,* 519 U.S. 854, 117 S.Ct. 149, 136 L.Ed.2d 95 (1996). The defendants here do not challenge the lawfulness of the initial traffic stop.

■ The detention associated with the traffic stop also "must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Anderson,* 114 F.3d 1059, 1063 (10th Cir.1997) (quoting *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Such a detention "usually must 'last no longer than is necessary to effectuate the purpose of the stop,' and '[t]he scope of the detention must be carefully tailored to its underlying justification.'" *United States v. Hunnicutt,* 135 F.3d 1345, 1349 (10th Cir.1998) (quoting *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). "An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States v. Hunnicutt,* 135 F.3d at 1349; *see United States v. Mendez,* 118 F.3d 1426, 1429 (10th Cir.1997). "Once the officer has conducted such a check and 'the driver has produced a valid license and proof that he is entitled to operate the car, [the driver] must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.'" *United States v. Anderson,* 114 F.3d at 1064 (quoting *United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.1994), *cert. denied,* 511 U.S. 1095, 114 S.Ct. 1862, 128 L.Ed.2d 484 (1994)).

■ There are two circumstances when detention can be lengthened by additional questioning. "First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring." *United States v. Hunnicutt,* 135 F.3d at 1349 (citation omitted); *see also United States v. Elliott,* 107 F.3d 810, 813 (10th Cir.1997). Second, further questioning unrelated to the initial stop is permissible if the initial detention is over and the encounter becomes consensual with the driver voluntarily consenting to additional questions. *United States v. Mendez,* 118 F.3d at 1429;

see also *United States v. Hunnicutt*, 135 F.3d at 1349.

■ To have "reasonable suspicion" of criminal activity, "the officer must acquire a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Villa–Chaparro*, 115 F.3d 797, 801–02 (10th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 326, 139 L.Ed.2d 252 (1997). "A variety of factors may contribute to the formation of an objectively reasonable suspicion of illegal activity." *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998). "The law does not specify a minimum of factors necessary to constitute reasonable suspicion." *United States v. Gutierrez–Daniez*, 131 F.3d 939, 942 (10th Cir.1997) (citation omitted), *cert. denied,* —— U.S. ——, 118 S.Ct. 1334, 140 L.Ed.2d 494 (1998). Arriving at reasonable suspicion is a process dealing with probabilities, not hard certainties, " 'as understood by those versed in the field of law enforcement.' " *United States v. Gutierrez–Daniez*, 131 F.3d at 942 (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

"Police officers need not close their eyes to suspicious circumstances." *Hunnicutt*, 135 F.3d at 1349 (citation omitted). Indeed, the officer "is entitled to assess the facts in light of his experience" when it comes to detecting criminal activity. *United States v. Brignoni–Ponce*, 422 U.S. 873, 885, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). "Law enforcement officers may perceive meaning in actions that appear innocuous to the untrained observer." *United States v. Gutierrez–Daniez*, 131 F.3d at 942 (citation omitted). On the other hand, an officer may not detain someone on an "unparticularized suspicion or hunch". *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "While the necessary level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence,' the Fourth Amendment requires 'some minimal level of objective justification.'" *United States v. Gutierrez–Daniez*, 131

F.3d at 942 (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (internal quotations omitted)).

In evaluating the factors alleged in support of reasonable suspicion, the court "judge[s] the officer's conduct in light of common sense and ordinary human experience." *United States v. Mendez*, 118 F.3d at 1431 (citation omitted). "This approach is intended to avoid unrealistic second-guessing of police officers' decisions and to accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. Gutierrez–Daniez*, 131 F.3d at 941 (quoting *United States v. Alvarez*, 68 F.3d 1242, 1244 (10th Cir.1995), *cert. denied,* 517 U.S. 1143, 116 S.Ct. 1436, 134 L.Ed.2d 557 (1996)). In *Mendez*, the Tenth Circuit summarized the court's approach in this way:

> "Our task … is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious," *United States v. Lopez–Martinez*, 25 F.3d 1481, 1484 (10th Cir.1994), but rather to determine whether the totality of the circumstances justify the detention. [*United States v.*] *McRae*, 81 F.3d [1528] at 1534 [ (10th Cir.1996) ]. We make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances, *id.*, remembering that reasonable suspicion represents a "minimum level of objective justification" which is "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (citation omitted).
>
> …. Although activities entirely consistent with innocent travel can, and frequently do, contribute to reasonable suspicion, *id.* at 9, 109 S.Ct. 1581, some facts are so innocuous and "so susceptible to varying interpretations" that they carry little or no weight. *United States*

*v. Lee,* 73 F.3d 1034, 1039 (10th Cir. 1996).

118 F.3d at 1431. "The government bears the burden of proving the burden of proving the reasonableness of the officer's suspicion." *United States v. Salzano,* 158 F.3d 1107, 1111 (10th Cir.1998).

 In determining whether a consensual encounter existed, a "court must focus on the totality of circumstances in a particular case." *United States v. Elliott,* 107 F.3d at 813–14 (citing *Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996)). Specifically, " 'a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.' " *United States v. Elliott,* 107 F.3d at 814 (quoting *United States v. Sandoval,* 29 F.3d 537, 540 (10th Cir. 1994)). Though recognizing little room for bright-line rules in this determination, the Tenth Circuit has applied at least one: "an officer must return a driver's documentation before the detention can end." *United States v. Mendez,* 118 F.3d at 1430 (citations omitted). "After an officer issues the citation and returns any materials provided, the driver is illegally detained only if the driver has objectively reasonable cause to believe that he or she is not free to leave." *United States v. Shareef,* 100 F.3d 1491, 1501 (10th Cir.1996) (citation omitted). On the other hand, the return of documentation "is not always sufficient to demonstrate that an encounter has become consensual." *United States v. Elliott,* 107 F.3d at 814 (citations omitted). "A 'coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled' may suggest that a detention has not ended." *United States v. Anderson,* 114 F.3d at 1064 (quoting *United States v. Turner,* 928 F.2d 956, 959 (10th Cir.), *cert. denied,* 502 U.S. 881, 112 S.Ct. 230, 116 L.Ed.2d 187

(1991)). The law enforcement officer need not specifically tell the driver that he is free to leave in order for the encounter to be consensual. *United States v. Anderson,* 114 F.3d at 1064. Finally, "[a] limited number of routine questions about travel plans and relationship to passengers, followed by a question about possession of contraband and a request to search, are not sufficient to render an otherwise consensual encounter coercive." *United States v. Hernandez,* 93 F.3d 1493, 1499 (10th Cir.1996).

### Arguments

The defendants contend that Trooper Brockman completed all acts properly attendant to the traffic stop after citing the defendant Garrett and returning the driver's licenses to Garrett and Mallard. The defendants argue that Trooper Brockman then unlawfully detained the defendants for further questioning on matters totally unrelated to the traffic stop without having reasonable suspicion that the men were engaged in criminal activity. Specifically, Trooper Brockman asked Mr. Garrett about a prior drug arrest and whether there were drugs in the vehicle after issuing the traffic citation. Trooper Brockman then told Mr. Garrett to remain in the patrol car, returned the driver's license to Mr. Mallard, questioned Mallard about his knowledge of Garrett's prior arrests, and asked for permission to search the pickup. The defendants argue their inconsistent travel plans and Mr. Garrett's prior arrests are an insufficient basis to form a reasonable suspicion of criminal activity.

The government argues that the initial traffic stop had transformed into a voluntary encounter prior to Mallard's consent to search the pickup. Alternatively, the government maintains that Trooper Brockman articulated sufficient grounds for his reasonable suspicion to detain the defendants while he asked unrelated questions about drugs and sought Mallard's consent to search.

## Merits

■ The court finds no merit to the government's argument that the initial traffic stop was a voluntary encounter even after Trooper Brockman requested that Mr. Garrett remain in the patrol car while he spoke with Mr. Mallard. A reasonable person in Mr. Garrett's circumstances would not believe he was free to leave or to disregard the trooper's request to stay in the patrol car. Nor would have Mr. Mallard felt free to leave with Mr. Garrett still sitting in the patrol car and with the Trooper not indicating whether Mr. Garrett could leave.

■ The government argues the following factors as supporting Trooper Brockman's reasonable suspicion: (1) the defendants were traveling north from Texas, which is a source state for drug trafficking; (2) the defendants traveled through Texas, a state emphasizing criminal interdiction, during the early morning hours when there are fewer officers patrolling the highways; (3) Mr. Mallard and Mr. Garrett gave accounts of their travel plans that seriously contradicted each other and were implausible; (4) Mr. Garrett displayed abnormally nervous and strange behavior; (5) Mr. Garrett had prior arrests for weapons and narcotics; and (6) Mr. Mallard and Mr. Garrett gave inconsistent stories of how long they had known each other and Mr. Garrett's current occupation. The court is satisfied that the combined evidentiary weight of these factors is sufficient for an officer with Trooper Brockman's experience and training to conclude there was reasonable suspicion of criminal activity occurring.

### Source State and Time of Day

In *United States v. Salzano*, 158 F.3d 1107, 1114 (10th Cir.1998), and *United States v. Wood*, 106 F.3d 942, 947 (10th Cir.1997), two panels essentially held that "the mere fact that one hails from a state known for drug trafficking is not sufficient to support reasonable suspicion unless the detainee is attempting to conceal the fact that he had come from a drug source area." *Salzano*, 158 F.3d at 1114 (citing *Wood*, 106 F.3d at 947). In *Salzano*, the panel was also critical that there was no evidence, other than the officer's testimony that California is a source state, *i.e.* "that vehicles coming from California are any more likely to contain drugs than those coming from ... any other western state." 158 F.3d at 1114.

Prior to these recent decisions, the Tenth Circuit had no difficulty recognizing as a contributing factor to reasonable suspicion that the defendant was traveling from a known drug source area. *United States v. Manuel*, 992 F.2d 272, 274 (10th Cir.1993) (the defendant "arrived on a bus from what the officers considered a 'source' state"); *United States v. Espinosa*, 782 F.2d 888, 891 (10th Cir.1986) (the defendant's car had a temporary Florida license plate). These earlier decisions did not condition this fact carrying any significance on whether the defendant tried to conceal the location of his departure. Nor did they require evidence beyond an officer's testimony. In at least one case, the Supreme Court directly recognized this source state factor without any condition that the defendant be attempting to conceal this fact. *Illinois v. Gates*, 462 U.S. 213, 243, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("In addition to being a popular vacation site, Florida is also well known as a source of narcotics and other illegal drugs." (citations omitted)); *cf. Ornelas v. United States*, 517 U.S. 690, 692, 698, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (Identified "source State" as one of the undisputed facts and summarized *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) as including the fact that the defendant "traveled from Miami, a source city for illicit drugs.").

The court believes the Supreme Court recognizes that source state or city can be a relevant factor whether or not the defendant attempts to conceal it from the officer. As an historical fact, its weight in any given case depends on its relationship to other historical facts and on certain back-

ground facts. The Supreme Court discussed in *Ornelas* the importance of an appellate court reviewing with deference the inferences drawn from placing historical facts within a given context of background facts:

> [W]e hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.

A trial judge views the facts of a particular case in light of the distinctive features and events of the community; likewise a police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference. For example, what may not amount to a reasonable suspicion at a motel located alongside a transcontinental highway at the height of the summer tourist season may rise to that level in December in Milwaukee. That city is unlikely to have been an overnight stop selected at the last minute by a traveler coming from California to points east.... It is a reasonable inference that a Californian stopping in Milwaukee in December is either there to transact business or to visit family or friends. The background facts, though rarely the subject of explicit findings, inform the judge's assessment of the historical facts.

In a similar vein, our cases have recognized that a police officer may draw inferences based on his own experience in deciding whether probable cause exists. (citation omitted). To a layman the sort of loose panel below the back seat arm rest in the automobile involved in this case may suggest only wear and tear, but to Officer Luedke, who had searched roughly 2,000 cars for narcotics, it suggested that drugs may be secreted inside the panel. An appeals court should give due weight to a trial

court's finding that the officer was credible and the inference was reasonable. 517 U.S. at 699–700, 116 S.Ct. 1657.

Based on Trooper Brockman's training and experience in criminal interdiction, the court finds his testimony quite credible that Texas, as a major border state, is known and considered to be a source area for narcotics and that drug couriers generally travel north from southern border states. Obviously, these facts alone are not enough to qualify as reasonable suspicion, but they can serve as a filter for assessing other facts and as a context for drawing other reasonable inferences. For example, Trooper Brockman testified that Texas is a state that emphasizes criminal interdiction. The defendants drove through Texas during the early morning hours when there are fewer officers patrolling the highways. *See United States v. Speal*, 166 F.3d 350, 1998 WL 886757, at *2 (10th Cir.1998) ("[T]he early hour" and the travel route were factors contributing to reasonable suspicion.) The emphasis of criminal interdiction in Texas and the advantage of traveling under the cover of night when there are fewer officers are facts not likely to escape the attention of those involved in drug trafficking. Trooper Brockman testified that his experience attests to these propositions, as his most significant drug seizures have occurred prior to 11:00 a.m. Thus, the court believes the point of departure, the direction of travel, and the time of travel are some circumstances supporting reasonable suspicion, but they are not by themselves sufficient to sustain that finding.

### Conflicting and Implausible Stories

On numerous occasions, the Tenth Circuit has said that "contradictory or implausible travel plans can contribute to a reasonable suspicion of illegal activity." *United States v. Mendez*, 118 F.3d at 1431; *see, e.g. United States v. McRae*, 81 F.3d at 1535; *United States v. Kopp*, 45 F.3d 1450, 1453–54 (10th Cir.), *cert. denied*, 514 U.S. 1076, 115 S.Ct. 1721, 131 L.Ed.2d 579 (1995). In *Wood*, the Tenth Circuit panel

opined, however, that the defendant's itinerary was not "the sort of unusual plans which give rise to reasonable suspicion" and that the defendant's error in identifying the city was "not the sort of inconsistency that" gives rise to a reasonable suspicion. 106 F.3d at 947. In *Salzano*, the Tenth Circuit panel opined that a discrepancy in the stated number of occupants between the rental agreement and the actual people occupying the vehicle was easily explained and " 'so innocent or susceptible to varying interpretations as to be innocuous.' " 158 F.3d at 1113 (quoting *Wood*, 106 F.3d at 946).

The discrepancies in defendants' travel plans are the sort of inconsistencies that plainly contribute to a finding of reasonable suspicion. The discrepancies are not easily explained as expected confusion over minor details. These discrepancies do not involve conduct that " 'describes a very large category of presumably innocent travelers' " and, therefore, can "be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous." *United States v. Lee*, 73 F.3d 1034, 1039–40 (10th Cir.1996) (quoting *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980)). Mr. Garrett was adamant that the wedding was that afternoon in Kansas City. Mr. Mallard said the wedding was for his friend and that it was tomorrow afternoon in Columbia. Such discrepancies suggest the defendants fabricated a purpose for their cross-country travel and they were unable to recall accurately their fictional plans with much accuracy. Both defendants initially said the person getting married was a mutual friend and then later said the person was really only Mr. Mallard's friend. In fact, Mr. Garrett apparently could not tell the Trooper the name of the person getting married. It is implausible for Mr. Garrett to be traveling cross-country to attend the wedding of someone who he doesn't even know by name but who may or may not be a mutual friend. They also did not agree on how long they had known each other or on whether Mr. Garrett was presently employed. Again, the distinct impression is that the defendants were trying to conceal the real purpose for their trip but had not worked out one or more of the essential parts to their fabricated story.

*Abnormal Nervous Behavior*

" 'While a person's nervous behavior may be relevant,' " the Tenth Circuit has been " 'wary of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials....' " *United States v. Peters*, 10 F.3d 1517, 1521 (10th Cir.1993) (quoting *United States v. Hall*, 978 F.2d 616, 621 n. 4 (10th Cir.1992)). The Tenth Circuit has said this factor is of "limited significance," because " '[i]t is common knowledge that most citizens, ..., whether innocent or guilty, when confronted by a law enforcement officer who asks them potentially incriminating questions are likely to exhibit some signs of nervousness.' " *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir.1994) (quoting *United States v. Millan–Diaz*, 975 F.2d 720, 722 (10th Cir.1992)). "Thus, absent signs of nervousness beyond the norm, we will discount the detaining officer's reliance on the detainee's nervousness as a basis for reasonable suspicion." *United States v. Salzano*, 158 F.3d at 1113. The Tenth Circuit in *Wood* discounted the officer's testimony, because he had no prior acquaintance with the defendant from which to contrast the defendant's arrest behavior. 106 F.3d at 948.

The court here does not discount Trooper Brockman's observations as witnessing nothing more than a generic case of nerves. From the start of the arrest, Trooper Brockman noticed that Mr. Garrett acted "a lot more nervous" than someone getting a warning citation for speeding. Garrett's behavior went "far beyond just the normal traffic stop." While the Trooper spoke to him in the patrol car, Mr. Garrett frequently made hand gestures and moved around in his seat, shifting in his seat like he was trying to look at

the Trooper and then turn away. At one point, Mr. Garrett even leaned against the passenger door and slumped over like he was trying to go asleep, but he sat up again and continued moving around in his seat. Trooper Brockman said this was the first time he had seen anyone appear to be going to asleep while receiving a citation.

From his sixteen years of experience patrolling Kansas highways, Trooper Brockman has noticed that in less than five percent of his traffic stops does he observe behavior that he believes to be abnormally nervous. More importantly, Trooper Brockman testified that his experience has proven that when a person acts unreasonably nervous then there is usually a reason behind it, such as invalid driver's license, outstanding warrant, or other criminal activity occurring. It also has been the Trooper's experience that most individuals will relax some after being told that only a warning would be issued or that no arrest would be made. In this case, Trooper Brockman said Mr. Garrett remained fidgety even after learning that he was receiving only a warning and that he was not going to be arrested. While nervousness alone cannot sustain a finding of reasonable suspicion, *United States v. Salzano*, 158 F.3d at 1113, it is a relevant factor that carries some significance here.

Nor will this court reject this factor just because Trooper Brockman did not know Mr. Garrett prior to the traffic stop. It is enough that the Trooper was able to contrast any changes in Mr. Garrett's nervous behavior after he was told that only a warning would be issued and that no arrest would be made. Because officers in this situation deal with probabilities and not certainties, the court believes it quite appropriate for Trooper Brockman to have gauged Mr. Garrett's nervous behavior against the thousands of other motorists that the Trooper has stopped under similar circumstances. It seems nonsensical to say that this factor can only be used if an officer has prior personal knowledge of the person's behavior in other settings. Reasonable suspicion deals with what experienced law officers understand to be proba-

ble as opposed to certain. *United States v. Gutierrez–Daniez*, 131 F.3d at 942.

*Prior Arrests*

"[K]nowledge of a person's prior criminal involvement (to say nothing of a mere arrest) is alone insufficient to give rise to the requisite reasonable suspicion." *United States v. Sandoval*, 29 F.3d 537, 542 (10th Cir.1994). In limiting the significance of this factor, the Tenth Circuit explained:

> If the law were otherwise, any person with any sort of criminal record—or even worse, a person with arrests but no convictions—could be subjected to a *Terry*-type investigation stop by a law enforcement officer at any time without the need for any other justification at all. Any such rule would clearly run counter to the requirement of a *reasonable* suspicion, and of the need that such stops be justified in light of a balancing of the competing interests at stake....

*Sandoval*, 29 F.3d at 543 (citation omitted). Prior criminal involvement "can, however, be a factor, along with other factors, giving rise to an articulable suspicion." *United States v. McRae*, 81 F.3d at 1535 n. 5. In *Wood*, the Tenth Circuit held: "Given the near-complete absence of other factors which reasonably gave rise to suspicion, the fact that Mr. Wood had previously been convicted of narcotics violations adds little to the calculus." 106 F.3d at 948.

The government takes issue with the Tenth Circuit's inclination to downplay this factor:

> Even though there appears to be a tendency to minimize the importance of a prior arrest or conviction, to the officers who are on the cutting edge in dealing with these situations, it is an extremely important factor. In fact, the knowledge of prior arrests, convictions or pending warrants can mean the difference between the officer going home after his shift or being carted away by an ambulance in the middle of it. Prior arrests and convictions, unlike winning the lottery, generally don't happen on a

completely random basis. Anyone who knows anything about the criminal justice system certainly knows about the high incidence of recidivism. The reality is that those who have been arrested or convicted of prior drug offenses are more likely to become involved in a subsequent drug offense. Law enforcement officers simply do not have the luxury to ignore this reality.

(Dk.35, pp. 8–9). This court generally agrees that law enforcement places more weight on this factor than the appellate courts. But as pointed out in *Sandoval*, it is the responsibility of the courts, not the officers, to balance the competing interests. 29 F.3d at 543. In the Tenth Circuit, the balance struck is that criminal history by itself does not constitute reasonable suspicion.

On the other hand, criminal history is an historical fact that can become more significant when linked with other historical or background facts. For example, prior criminal involvement is a noteworthy factor when the person is traveling from a source state along a recognized drug distribution route during a time that reduces the risk of criminal interdiction and for reasons that seem implausible or likely to have been fabricated. In other words, prior criminal activity presents the officer with suspicion of an illicit motive for travel when the proffered motive is subject to serious doubt or question.

Trooper Brockman testified that a large number of the persons which he had arrested for drugs during traffic stops had prior criminal involvement with drugs. When Trooper Brockman asked Mr. Garrett if he had any prior arrests for the legitimate purpose of deciding whether to arrest him for driving with a suspended license, the defendant did not indicate any arrest involving drugs. The radio dispatcher later informed the Trooper that the Triple I check on Mr. Garrett showed a prior narcotics arrest. The defendant denied that he was arrested for drugs and that someone named James Robinson had used the defendant's name as an alias. In short, the defendant's criminal history was a suspicious circumstance not only because it involved prior drug activity but because the defendant tried to distance himself from the drug arrest by not disclosing it earlier to the Trooper and then by later denying it.

In sum, the court believes the facts and inferences viewed in the context of the "whole picture" and assessed in light of Trooper Brockman's training and experience, sustain the reasonableness of the Trooper's suspicion that the defendants were engaged in criminal activity.[1] Thus, Trooper Brockman was justified in briefly detaining the defendants while he asked if there were drugs in the pickup and whether he could search the pickup. Other than the illegal detention, the defendant Mallard does not challenge the voluntariness of his consent to search the pickup. For all of these reasons, the defendants' motion to suppress is denied.

IT IS THEREFORE ORDERED that the defendant Mallard's motion to adopt and join the defendant Garrett's motions (Dk.34) is granted subject to the conditions set out in this court's Criminal Procedural Guidelines at paragraph I(F);

IT IS FURTHER ORDERED that the defendant Garrett's motion for disclosure of 404(b) evidence (Dk.30) is denied as moot;

---

1. As this written decision displays, this court is not using the "totality of the circumstances" analysis as a "mantra" to "metamorphose" innocuous facts into reasonable suspicion. *See Wood,* 106 F.3d at 948. This court, however, fully recognizes that this is a case where "unrealistic second-guessing" of officers' decisions, *United States v. Alvarez,* 68 F.3d at 1244; disrespect for officer's training and experience to distinguish between innocent and suspicious actions, *see United States v. Cortez,* 449 U.S. at 418, 101 S.Ct. 690; and pigeonholing the facts as consistent with innocent travel or not, *United States v. Lopez–Martinez,* 25 F.3d at 1484; could yield a different result.

IT IS FURTHER ORDERED that the defendant Garrett's motion to suppress evidence (Dk.31) is denied.