**UNITED STATES of America,**
**Plaintiff,**

v.

**Jose Alonzo JURADO–VALLEJO,**
**Defendant.**

No. 02–40115–01–JAR.

United States District Court,
D. Kansas.

April 16, 2004.

---

Thomas G. Luedke, Topeka, KS, for Plaintiff.

Melody J. Evans, Topeka, KS, for Defendant.

### ORDER ON REMAND MAKING ADDITIONAL FINDINGS OF FACT

ROBINSON, District Judge.

This matter is before the Court on the February 10, 2004 Order and Judgment of the Tenth Circuit Court of Appeals, remanding the case to this Court "for more detailed findings regarding [Trooper] Jirak's experience and observations." The Tenth Circuit further directed that this Court "... may also reconsider its legal conclusions based on the law set forth in this order and judgment."

**Procedural Background**

This Court granted defendant Jose Alonso Jurado–Vallejo's motion to suppress, finding that defendant did not consent to the search of his vehicle. In the alternative, the government argued that there was probable cause to search the vehicle. As this Court explained in its Order (Doc. 43) denying the government's motion for reconsideration, Trooper Jirak's observation of alterations to the bed of the Expedition gave him reasonable suspicion to further detain and investigate, but this reasonable suspicion never ripened into probable cause.

In its order of remand, the Tenth Circuit Court of Appeals directs this Court for more detailed findings concerning evidence of the hidden compartment, and Trooper Jirak's experience and observation. The Tenth Circuit noted that it was unclear whether this Court was:

(1) "crediting all Jirak's testimony but ruling that probable cause could not be established unless he took steps to 'confirm' or 'verify' conclusively the existence of a hidden compartment;" (2) taking "into account Jirak's observations when he stooped down to examine the wheel well for two to three seconds just before beginning his search;" or (3) not believing or giving full credit to "Jirak's testimony regarding the clarity of his observations or the extent of his knowledge of the structure of motor vehicles and hidden compartments. As Defendant points out on appeal, Jirak's testimony was partially contradicted by the videotape of the stop, he lacked experience observing modifications to 2002 Ford Expeditions, and it would have been difficult to observe modifications while traveling at 65 miles per hour."

To that end, the Court makes the following additional findings of fact.

**Additional Findings of Fact**

Trooper Jirak, a Kansas highway patrolman with more than 16 years of experience, has attended a number of courses and schools on narcotics interdiction and investigation. He has been involved in over 100 cases where hidden compartments have been used to transport narcotics; of these 100 plus cases, about 50 of them were cases he initiated.

Prior to effecting the traffic stop of defendant, Trooper Jirak observed that the rear bumper of defendant's Ford Expedition appeared to be altered. Jirak observed that the bottom of the Expedition's rear bumper was "squared off," whereas the factory installed bumper on this model is tapered. Pulling alongside the Expedition for about one minute, and while traveling between 65 and 70 mph, Trooper Jirak was able to see inside the wheel well, which he testified was brightly illuminated by the sun. Jirak testified that inside the

wheel well, he could detect the bottom of the Expedition's truck bed; and he was able to tell that the bottom of the truck bed was approximately 3 inches lower than the bottom of the hatchback door, where the bottom of the factory installed truck bed should be. Jirak testified that he could also see a seam that had been bonded and coated over, and that such a seam would not be present in an unaltered model of this vehicle.

The Court credits this testimony of Jirak, although these alterations he observed in the wheel well are not depicted with clarity in a photograph taken of the wheel well at the scene of the traffic stop, approximately ten minutes after the stop. Although Jirak had experience and credibly testified that he observed what appeared to be alterations, he did not, prior to the stop, have a long or good opportunity to view or inspect these perceived alterations in the vehicle. Jirak's observations were made over a one minute span of time, as he drove down the highway at 65 to 70 mph. Nevertheless, based on the substance of Jirak's testimony and his demeanor while testifying, the Court believes Jirak's testimony that he observed these alterations prior to the traffic stop.

The Court further finds that based on his observations prior to the stop, Jirak inferred that these perceived alterations evidenced a three inch void or discrepancy between the bottom of a factory installed truck bed and the bottom of the altered truck bed. Jirak certainly had the experience to make such an inference. He had handled approximately 12 to 15 cases in which a hidden compartment was constructed in a void created by a lift of the bed of the truck, as the hidden compartment in this case turned out to be. Jirak had also seen seams with undercoating where metal boxes or compartments had been added to the bottom of the truck bed.

But the existence of a void was an inference, it is not something Jirak actually observed prior to the traffic stop.

It is important to note that Jirak's testimony on direct examination is confusing in that he seems to mix an account of what he observed prior to this traffic stop, with what he could have only ascertained after the stop and during the subsequent search of his vehicle. Jirak testified that the three inch lift he observed created a "... three inch void. And that covered the area of the bed from, on this Expedition, from the backseats to the rear of the vehicle and the entire width of the vehicle." But this testimony could not have been an account of what Jirak observed prior to the stop. For prior to the stop, Jirak only observed two things, the back side of the vehicle, and the apparent alterations inside the rear wheel well. Prior to the stop, he never observed the passenger side of the vehicle or the wheel wells on the passenger side. Jirak could not have actually observed the void or its dimensions prior to the stop. This testimony is an account of what he inferred based on his experience and his limited observations prior to the stop.

More importantly, after the stop and before Jirak commenced the search, he did not observe or inspect the passenger side of the vehicle and did not inspect the wheel wells on the passenger side. Jirak testified, and the videotape of the stop confirms, that after the stop and before the search, Jirak peered into the back side windows of the vehicle. He testified that he observed that there were no apparent alterations to the interior of the truck bed. And, after the stop and before the search, Jirak did not inspect or observe the undercarriage of the vehicle either. Thus, his testimony about a three inch void was the product of inference, not actual observation prior to the search.[1]

---

**1.** Jirak testified that during his subsequent

search of the vehicle, he found access to the

After he stopped the vehicle, Jirak did not do any significant inspection or observation of the alterations he had seen before the stop. Jirak testified that he looked at the wheel well a couple of times; the videotape corroborates this testimony. The videotape continuously recorded all of Jirak's actions around the exterior of the vehicle during the stop, and is better evidence than Jirak's recollection some three or four months after the stop. The videotape shows the very limited observations that Jirak made after he stopped the vehicle and before he commenced his search of the vehicle. The vehicle stop commenced at approximately 8:26 a.m. Jirak commenced his search of the vehicle at approximately 8:30:20 to 8:30:25, when he opened the driver's door and appeared to pull a release of the hatchback door.

During this four minute period between the stop and the search, Jirak spent part of the time in his patrol vehicle, checking on the defendant's drivers license and car registration. For the rest of the four minute period, Jirak was conversing with the defendant or looking at the car. But, the videotape shows that Jirak spent almost no time observing or inspecting the wheel well, the back end of the vehicle, or any other exterior part of the vehicle. The stop commenced at 8:26. The videotape first records Jirak approaching the vehicle from the rear, where Jirak's patrol car was parked. Before making contact with the defendant, Jirak stands at the back end of the vehicle and for about 6 seconds (8:26:19–8:26:25) appears to be looking at the beauty ring around the license plate. Although one could argue that Jirak was looking at the squared off bumper or some other evidence of alteration, he did not testify that he looked at the bumper. And

the tape seems to show him looking at the beauty ring during these six seconds. This makes sense because Jirak stopped the vehicle on the basis of reasonable suspicion that the beauty ring was obscuring the license tag, in violation of Kansas law.

Jirak is next seen walking to the driver's side window and making contact with the defendant who was seated in the driver's seat. Jirak did not even glance at the wheel well at this time. After conversing with the defendant, the tape shows Jirak walking back towards the patrol car. At 8:27:14 the tape shows Jirak stopping to peer inside the back side window of the vehicle, as he testified. Then, Jirak continues walking towards his patrol car. It was at this point that Jirak looked at the rear wheel well. But he only looked for one second (8:27:24–8:27:25), and he never stopped walking as he looked. He did not bend down to gain a closer view, but while walking in an upright position, he glanced at the wheel well for one second.

After Jirak spent about two minutes back in his patrol car, the videotape shows him returning to the defendant's vehicle. As Jirak walked back to the driver's window, he quickly glanced downward in the direction of the wheel well (8:29:45), he did not stop walking, did not bend down, did not do anything to gain a closer view. Jirak returns the documents to the defendant and at 8:30:03 the tape shows Jirak waving to the defendant and the tail lights coming on. Jirak testified that at this point the traffic stop had ended, and at this point he attempted to gain the defendant's consent to search.[2] At 8:30:13 the tape shows Jirak beckoning with hand motions for the defendant to exit the vehicle.

---

void behind the second set of seats in the Expedition. He accessed a false compartment by pulling up the carpet right behind the second set of passenger seats and found a

hinged lid to that approximately 3 inch thick compartment.

**2.** This Court previously ruled that there was not a valid consent.

The tape then shows Jirak bending from his waist and looking at the wheel well for three seconds (8:30:15–8:30:18) from about three feet away.[3] Jirak then commenced the search by opening the driver's door and releasing the hatch.

Thus, during the four minute period between the stop and the search, Jirak's very brief observations prior to the stop were barely enhanced by two cursory glances as he quickly walked by and a three second observation made from a closer, more level view of the wheel well. That was the extent of Jirak's use of the brief period in which he had the vehicle in the status of investigative detention. Prior to the search, Jirak did not touch or probe the rear driver side wheel well; he did not observe or inspect the other wheel wells; and he did not observe, inspect or touch the undercarriage of the vehicle.

Moreover, in effecting the stop, Jirak encountered a defendant who produced a valid driver's license and car registration. Jirak testified that the defendant was very cooperative, very courteous and calm. Jirak testified that the defendant displayed no nervousness. The defendant indicated that he was coming from Mexico and going to Kansas City to visit a friend, and he had a garment bag and travel bag in the vehicle. Jirak did not testify to any suspicious behavior by the defendant. Jirak did not testify that the defendant related suspicious, vague or inconsistent travel plans. Jirak did not testify that he detected the odor of drugs, air fresheners or other masking agents.

**Discussion**

■ As the Tenth Circuit noted in its order of remand, probable cause to search a vehicle is established if under the totality of the circumstances there is a fair probability that the car contains contraband or evidence;[4] and an officer may draw inferences based on his own experiences.[5] Under these standards, there was no probable cause to search this vehicle.

■ Giving due consideration to the cases cited in the Order of Remand, many of which this Court discussed in its suppression and reconsideration orders, this Court concludes that none of the cases supports a conclusion that there was probable cause in this case. For in none of the cited cases was probable cause to search or arrest premised solely on a minute long observation of an apparent alteration from a rapidly moving patrol, a three second look at an apparent alteration after the traffic stop along with the officer's inferences based on these limited observations. Rather, in these cases, probable cause was premised on observation and manual inspection that led to the discovery of a number of indicia of a hidden compartment. And, some of these cases further relied upon other circumstances, such as the odor of drugs and suspicious behavior or suspicious statements from the defendant.

■ As the Tenth Circuit stated in its order of remand, "[i]t is well established that evidence of a hidden compartment can **contribute** to probable cause to search," citing to *United States v. Vasquez–Castillo.*[6] But in *Vasquez–Castillo*, the probable

---

**3.** The Tenth Circuit questioned whether this Court had taken "into account Jirak's observations when he stooped down to examine the wheel well for two to three seconds just before beginning his search."

**4.** *United States v. Nielsen*, 9 F.3d 1487, 1489–90 (10th Cir.1993).

**5.** *United States v. Mercado*, 307 F.3d 1226, 1230 (10th Cir.2002).

**6.** 258 F.3d 1207, 1213 (10th Cir.2001) (emphasis supplied). *See also United States v. Mercado*, 307 F.3d 1226, 1230 (10th Cir.2002) (Evidence of a hidden compartment can contribute to probable cause to search. Thus, an "officer's observation of the altered ceiling [in the van], if coupled with legitimately suspi-

cause determination did not rely solely on brief observations of apparent alterations. Rather, the officer observed a number of factors indicative of a hidden compartment including: a crack in the wall of the trailer, through which the officer saw a space between the inner wall and outer hull of the trailer; the front wall of the trailer had footprints on it with the toe facing down; the trailer was exceptionally clean; the trailer had shiny new side rails while the rest of the trailer and truck was fairly old; and an air vent in the trailer appeared to lead to nowhere.[7] These observations are indicative of more than a cursory glance, more than a one minute observation from a car traveling on the highway, and more than a three second look from three feet away.

Of course, in *Vasquez–Castillo,* the initial search and a later more expanded search, were consensual.[8] The case is nevertheless illustrative of the type of inspection or studied observation that an officer engages in to develop reasonable suspicion into probable cause. Moreover, in *Vasquez–Castillo,* these more detailed and studied observations were buttressed by other compelling circumstances: there appeared to be an unusually small amount of cargo in the trailer and the officer detected a strong odor of marijuana in the trailer.[9]

A similar degree of observation and inspection was performed in the *Soto* case,[10]

where the Tenth Circuit held that there was probable cause to arrest the defendant after a consensual search had yielded certain evidence. Probable cause was premised on these factors: the officer observed that the spare tire was out of place in the trunk; the officer observed that the matting covering the bottom of the trunk was in disarray; the officer pulled up on the matting which came up easily, revealing what looked like fresh glue that was not set; the officer observed that the area under the matting appeared to have been freshly painted; and the officer discovered that under the matting there was a seal about two inches wide that appeared to run completely across the trunk from side to side about a quarter of the way up on the hump above the gas tank.[11]

In the *Anderson* case,[12] a similar degree of observation and inspection yielded sufficient evidence to render probable cause. In *Anderson,* during a consensual search, the officer found loose screws in the back of the SUV, and on inspection, found that the floor was "built up."[13] The officer also inspected underneath the vehicle, where he noticed fresh paint, new hoses and clamps, and fresh tool marks on and around the gas tank.[14] Not relying solely on these visual observations, the officer used a flexible scope to look underneath the car through the fender well in the back right tire between the frame rail and the body itself.[15] There the officer observed a trap door in the top of the gas tank.[16] In the same vein, in the *Arango* case,[17] there was

---

cious activity, would give rise to probable cause") (emphasis supplied).

7. *Vasquez–Castillo,* 258 F.3d at 1209–10.

8. *Id.* at 1210.

9. *Id.* at 1209.

10. *United States v. Soto,* 988 F.2d 1548 (10th Cir.1993).

11. *Id.* at 1551.

12. *United States v. Anderson,* 114 F.3d 1059 (10th Cir.1997).

13. *Id.* at 1062.

14. *Id.*

15. *Id.* at 1062–63.

16. *Id.* at 1063.

17. *United States v. Arango,* 912 F.2d 441 (10th Cir.1990), *cert. denied,* 499 U.S. 924, 111 S.Ct. 1318, 113 L.Ed.2d 251 (1991)

probable cause to arrest the defendant based on observations and inspection (again in the context of a consensual search) revealing: the officer observed that the bed of the truck was very shallow; the officer lifted the tailgate corner of a rubber mat covering the bed of the truck and observed that the section seams in the truck bed were wide and rough, as if they had been puttied in by hand; the officer observed bolts on the sides of the bed did not match the color of the pick-up; the officer observed that the bed appeared to have been freshly painted; the officers felt under the undercarriage and discovered that a gap of several inches existed; and two officers took turns tapping on the bed of the truck, but neither of them could feel the taps on the other side, suggesting that the truck had a false bed.[18]

In this case, had Trooper Jirak's search been valid, the additional evidence he discovered during the course of the search, together with his initial observations, might well have provided probable cause: Jirak pulled up the carpet behind the second set of seats in the Expedition; under the carpet, Jirak found a hinged lid; under the lid Jirak found a 3 inch thick compartment. But, Jirak did not develop probable cause through sufficient observation and inspection prior to commencing the search. Prior to commencing the search, Trooper Jirak could have done a thorough visual inspection of the other wheel wells; he could have touched the alterations he saw in the wheel well; he could have poked, prodded or knocked on the wheel wells, bumper or fenders to attempt to ascertain whether there was a void as he suspected. Instead, Trooper Jirak elected to seek the defendant's consent to search. Because that search was not consensual, the fruits of the search cannot now be used to support probable cause for the search.

While this Court concludes that probable cause is necessarily premised on more than cursory observation, this Court is not suggesting that probable cause requires *verification* of the existence of a hidden compartment, although that was the basis for probable cause in the *Nicholson*[19] case cited in the order of remand. To establish probable cause, the officer need not verify that the suspected hidden compartment exists; but the officer must do more than a cursory observation.

As the cited cases illustrate, probable cause is developed through careful observation and inspection that relies not only on the officer's vision, but use of the officer's other senses, such as touch, where possible. Often the totality of circumstances rendering probable cause includes other factors, as well, such as the odor of drugs, the odor of masking agents and/or suspicious statements or behavior by the defendant.[20] Here, not only was there in-

---

**18.** *Id.* at 443.

**19.** *United States v. Nicholson,* 17 F.3d 1294, 1297 (10th Cir.1994) (in a consensual search, officers discovered a hidden compartment, not just alterations or other evidence indicative of a hidden compartment. Discovery of the hidden compartment rendered probable cause to expand or continue the search.)

**20.** In fact, other indicia of suspicious activity were present in each of the cases cited by the Court. In *Soto,* officers noted that the defendant's hands were shaking; he seemed "panicky"; and he told officers the vehicle he was driving belonged to his uncle, but he could not remember his uncle's address. 988 F.2d at 1550. Similarly, in *Anderson,* the defendant and his female passenger gave inconsistent accounts of the couple's travel plans; the officer detected the scent of air fresheners in the vehicle; and the defendant carried a pager, which the officer testified is commonly carried by drug traffickers. 114 F.3d at 1061–62. And, in *Arango,* the defendant told officers that he and his passenger were going to Denver, Colorado for a two-week vacation, but they only had two small bags of clothing, which the officers considered inadequate for an extended vacation. 912 F.2d at 443. Finally, in *Nicholson,* the officer smelled marijuana, the defendant told officers he had just

sufficient observation and inspection, there were not other circumstances that could factor into probable cause. The defendant did not act suspiciously; he was cooperative, courteous and calm. His travel plans were not suspicious. His driver's license and car registration were valid.

■ The factors relied on by the government in this case are sufficient to establish reasonable suspicion, but not to establish probable cause. As the Tenth Circuit stated in *United States v. Orrego–Fernandez*,[21] an observation of an alteration does not automatically give rise to reasonable suspicion to detain and investigate. To establish reasonable suspicion, "[t]he trooper must go beyond the inarticulable hunch that all customized vehicles contain hidden compartments and point to specific factors which justify the objectively reasonable conclusion that particular alterations indicate a hidden compartment which may contain contraband."[22]

In *Orrego Fernandez* the trooper made the following observations while following or driving parallel to the defendant's vehicle: (1) the truck was freshly painted and had a bright finish; (2) the truck frame was noticeably lower in the back than the front; (3) the leaf springs on the rear axle were only about five inches from the pavement; and (4) the wheel well was solid black and no air space could be seen.[23] In addition, the trooper observed what he believed to be a gas tank hanging two to three inches below the frame of the truck, which increased his suspicion that the truck had been altered to transport contraband.[24] The Tenth Circuit held in *Orrego Fernandez* that this totality of circumstances established reasonable suspicion.[25] *United States v. Mendez*[26] similarly held that because "signs that a vehicle's paneling or natural configuration has been altered often lead law enforcement officers to the discovery of contraband," such observations "could contribute to ... [a] reasonable suspicion of illegal activity."[27]

Trooper Jirak's observations prior to the stop established reasonable suspicion. His brief observations after the stop continued to establish reasonable suspicion but did not augment or develop the reasonable suspicion into probable cause. Nor did the defendant's statements or behavior cause the reasonable suspicion to develop into probable cause.

Finally, the Court notes that the order of remand mentions that the defendant was a citizen of Mexico and was traveling from Mexico, a known source of drugs. But, that additional factor does not have sufficient weight to turn reasonable suspicion into probable cause.

**Conclusion**

Reasonable suspicion is not synonymous with probable cause. Trooper Jirak's cursory visual observations, his failure to augment his observations by inspecting, touching or probing these perceived alterations in the wheel well, and his failure to observe or inspect any other areas of the vehicle, did not develop the reasonable suspicion into probable cause. Instead, Jirak began to search, thinking that he had ob-

purchased the truck, but produced a title for a 1972 Ford, when he was driving a 1972 Chevrolet, and the defendant told officers he was going to fish in the Great Salt Lake, but he did not have a fishing license. 17 F.3d at 1297–98.

**21.** 78 F.3d 1497 (10th Cir.1996).

**22.** *Id.* at 1505.

**23.** *Id.* at 1504.

**24.** *Id.*

**25.** *Id.* at 1505.

**26.** 118 F.3d 1426 (10th Cir.1997).

**27.** *Id.* at 1432 (quotation and alteration omitted).

tained a valid consent. And, although Jirak's search resulted in more evidence of alterations, and ultimately resulted in his actual discovery of the hidden compartment, the government cannot rely upon this post search evidence to establish probable cause for the search.