**UNITED STATES of America,**
**Plaintiff,**

v.

**Travis John LAMBERT, Defendant.**

No. 04–40102–01–SAC.

United States District Court,
D. Kansas.

Dec. 1, 2004.

---

Marilyn M. Trubey, Office of Federal Public Defender, Topeka, KS, for Defendant.

Thomas G. Luedke, Office of United States Attorney, Topeka, KS, for Plaintiff.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

The case comes before the court on the defendant's following pretrial motions: Motion to Suppress Evidence and Statements (Dk.19), Motion for Discovery Related to Drug Detection Dog (Dk.20), and Motion to Suppress Statement (Dk.21). The government has filed a consolidated response (Dk.22) opposing these pretrial motions. On November 16, 2004, the parties presented their evidence and arguments. The defendant emphasized his request for court-ordered discovery concerning the drug detection canine and for additional time to file any related motions. After reviewing all submissions and researching the law relevant to the issues, the court is ready to rule.

## INDICTMENT

The defendant is charged in a two-count drug trafficking indictment. Count one charges that on August 6, 2004, the defendant possessed with the intent to distribute approximately 850 grams of methamphetamine. Count two charges that from on or about July 20, 2004, to on or about August 6, 2004, the defendant conspired with others to distribute and to possess with the intent to distribute in excess of 500 grams of methamphetamine.

## MOTION TO SUPPRESS EVIDENCE AND STATEMENTS (Dk.19)

On August 6, 2004, the Kansas Highway Patrol was operating a drug check lane ruse near exit 138 on Interstate 135. Just over one-half mile west of this exit, there was a white sign with black lettering that read "DRUG CHECK LANE 1 MILE AHEAD." [1] The next sign visible to a person traveling east was the standard large interstate sign indicating that the next exit was exit 138, "County Rd U," and it was one-half mile away. Just before exit 138, there were two signs, similar in size and lettering to the first drug check lane sign, that were posted on both sides of the road and that read "K–9 IN USE 1/2 MILE." There were no signs along I–35 to indicate the availability of any services at exit 138. The exit was principally used by local traffic accessing nearby farmsteads and a dirt/gravel plant.

Clint Epperly, a trooper with the Kansas Highway Patrol assigned to patrol a three county area with emphasis along I–35, borrowed these three drug check lane signs from the Lyon County Sheriff's Department and posted them that day. The signs were part of a ruse, as there was no drug check lane ahead. Trooper Epperly was parked a short distance south of exit 138 facing northbound on the shoulder of County Road U observing the vehicles using this exit. [2] The trooper explained that the ruse was intended to alert him to drug traffickers who in response to the signs

---

1. From photographs admitted into evidence, the sign appears to be approximately twelve inches by eighteen inches in size. The sign was attached to one of the reflective metal posts lining the edge of the interstate highway.

2. From the photographs admitted into evidence, it appears that the driver of a vehicle traveling northbound on I–35 would not have seen Trooper Epperly's parked patrol car until after proceeding some distance up exit ramp 138. Trooper Epperly testified that his patrol car was visible from the stop sign at exit ramp 138.

would act irrationally and take the first available exit to avoid the announced drug check lane and drug detection dogs. Because the exit offered nothing to travelers other than access to local farmsteads and the gravel plant, the trooper watched particularly for vehicles with out-of-state or out-of-county license plates using this exit.

Around 5:55 p.m, Trooper Epperly observed a white Ford pick-up stop at the top of the ramp to exit 138. The pickup turned in the direction of the trooper and stopped along side the patrol car. The driver rolled down his window on the driver's side and then exited the pickup leaving it stopped in the middle of the southbound lane of County Road U. Walking around the pickup and up to the passenger side of the patrol car, the driver asked Trooper Epperly where he could get a tire fixed as one of his tires had low air pressure and felt wobbly on the road. Trooper Epperly exited his patrol car expecting to help the driver with a flat tire. The driver showed Trooper Epperly the tire about which he was complaining. The tire did not appear to have low air pressure or to be losing tread, and Trooper Epperly could not see anything wrong with the tire.

At this point, Trooper Epperly noticed that the driver was unusually nervous for someone who was approaching a trooper ostensibly for help. The driver's hands were visibly shaking. Trooper Epperly also was able to see that the truck had Arizona license plates. Based upon his training and experience, Trooper Epperly testified that I–35 is a common drug traffic corridor with drugs typically flowing north from source states like Texas, New Mexico, Arizona, and California, which are located along the border with Mexico from which a substantial amount of drugs come into the United States. Trooper Epperly asked about travel plans and learned that the defendant had left Phoenix, Arizona, and was headed to Des Moines, Iowa, for a construction job. Trooper Epperly was suspicious of the driver's story about taking exit 138 because of tire concerns. Not only did the tire look "perfectly fine" but the defendant had taken an exit with no advertised services and had just passed the Emporia exit eight miles earlier which advertised itself as offering all kinds of motorist services. Suspicious about these circumstances, Trooper Epperly asked for the driver's operating license and proof of insurance and directed the defendant to move his truck off the roadway and in front of the patrol car.

Trooper Epperly radioed Deputy Cory Doudican with the Lyon County Sheriff's Department. He asked Deputy Doudican, a trained drug detection dog handler, to come to scene and check the pickup with the dog. When he received Trooper Epperly's call, Deputy Doudican was approximately one-half mile away from the exit.

The driver produced an Arizona license that identified him as Travis Lambert. When he reached his patrol car with the defendant's documents, Trooper Epperly activated his video camera and radioed dispatch with requests for NCIC and Triple I checks. While waiting to hear back from dispatch, Trooper Epperly wrote a traffic violation warning. The defendant's driver's license was valid and the vehicle insurance was current. Deputy Doudican arrived on the scene and approached the patrol car when dispatch radioed that there was a positive Triple I on the defendant. Trooper Epperly and Deputy Doudican returned to the pickup, and Trooper Epperly asked the defendant to join him in the patrol car while Deputy Doudican employed his dog.

On the way back to the patrol car, Trooper Epperly first asked the defendant if there was someone the defendant wanted him to call about fixing the tire and then asked whether there were any illegal

drugs in the pickup. The defendant said there were no drugs. In the patrol car, Trooper Epperly continued to receive Triple I information from dispatch which indicated that the defendant had a prior arrest for drugs. The trooper and the defendant discussed the Phoenix area and the travel plans of the defendant's employer. Trooper Epperly then asked the defendant if he had been arrested for drugs in 2002, and the defendant answered, "no."

The video shows Deputy Doudican walking his dog around the pickup once with an extended stop at the rear of the pickup outside the view of the video camera. The deputy is next seen stepping into view and giving a thumbs up sign. The video shows the deputy and his dog walking around the rear of the pickup before the deputy returned the dog to the patrol car. During this period, Trooper Epperly was still receiving information from dispatch.

Trooper Epperly gave the defendant a written warning and explained that the defendant failed to stop properly at the stop sign. Trooper Epperly then informed the defendant that the drug dog alerted to his pickup and repeated his question whether there were drugs in the vehicle. The defendant again denied the presence of drugs. Upon being told that his pickup would now be searched for drugs, the defendant objected, and Trooper Epperly explained that the dog had alerted. The defendant was asked to step outside the patrol car, patted down for possible weapons, and was watched by Deputy Doudican as Trooper Epperly searched the pickup.

Before commencing the search, Trooper Epperly was told by Deputy Doudican that the dog had alerted "scratching all over it." After searching for a couple of minutes in the cab of the truck, Trooper Epperly returned to the patrol car carrying a wrapped package. He told the defendant that he didn't know whether the package was illegal yet but that the defendant was under arrest for the pipe or drug paraphernalia found in the cab. The defendant was warned of his Miranda rights and then asked if he would answer the trooper's questions. The defendant consented and answered the trooper's questions revealing that he had recently smoked methamphetamine ice in the pipe and that there were two pounds of methamphetamine ice in the truck cab.

**MOTION TO SUPPRESS EVIDENCE AND STATEMENTS (Dk.19)**

The defendant seeks to suppress all items seized from his car arguing he was unlawfully detained and the drug detection dog was used without probable cause. The government contends first that the encounter was voluntary and alternatively that Trooper Epperly developed a reasonable suspicion for detaining the defendant while the drug detection dog was deployed.

■ Supreme Court precedent categorizes three general types of police-citizen encounters: "(1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, [which are] the most intrusive ... and [are] reasonable only if supported by probable cause." *United States v. Davis,* 94 F.3d 1465, 1467–68 (10th Cir.1996) (citations omitted). If the encounter is consensual, the Fourth Amendment prohibition on unreasonable searches and seizures is not triggered. *See United States v. Walker,* 933 F.2d 812, 816–17 (10th Cir.1991), *cert. denied,* 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992). "A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer." *United States v. Hernandez,* 93 F.3d 1493, 1498 (10th Cir.1996). "[A] seizure does not occur

simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual.'" *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

In deciding if a seizure occurred, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *United States v. Hill,* 199 F.3d 1143, 1147 (10th Cir.1999) (quoting *Bostick,* 501 U.S. at 437, 111 S.Ct. 2382), *cert. denied,* 531 U.S. 830, 121 S.Ct. 83, 148 L.Ed.2d 45 (2000). Put another way, "[a] person is seized only when that person has an objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her way." *United States v. Hernandez,* 93 F.3d at 1498 (citation omitted). There are no per se or absolute rules controlling this inquiry. *See Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). "Rather, every case turns on the totality of the circumstances presented." *United States v. Little,* 18 F.3d 1499, 1503 (10th Cir. 1994).

■ In deciding whether a reasonable person would have not felt free to leave an encounter with an officer, a court considers the following to be some of the relevant factors: the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public. *United States v. Sanchez,* 89 F.3d 715, 718 (10th Cir.1996). No one factor is dispositive in this analysis. *United States v. Glass,* 128 F.3d 1398, 1406 (10th Cir.1997).

■ The facts establish that the defendant voluntarily stopped his vehicle and approached Trooper Epperly on foot with a request for directions to a nearby business that could fix a tire. The conversation about the tire, Trooper Epperly's inspection of the tire and questions about the defendant's travel plans did not alter the consensual nature of this encounter. In these circumstances, a reasonable person would feel free to disregard the questions and go about his business. "A police officer does not have to inform the citizen they are free to disregard any further questioning for the encounter to be consensual." *United States v. Manjarrez,* 348 F.3d 881, 886 (10th Cir.2003) (citation omitted), *cert. denied,* —— U.S. ——, 124 S.Ct. 1622, 158 L.Ed.2d 259 (2004). The court is satisfied, however, that a seizure did occur upon Trooper Epperly taking the defendant's license and registration to his patrol car and running a license check and NCIC. At that point, Trooper Epperly showed his authority in taking the defendant's license and proof of insurance thus preventing the defendant from leaving scene. A reasonable person in this position would have not felt free to leave without a driver's license and proof of insurance. Trooper Epperly also directed the defendant to move his car off the road and

close to the patrol car. These circumstances would have communicated to a reasonable person that he was not at liberty to ignore Trooper Epperly.

. Consistent with Fourth Amendment principles, an officer "may conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citing *Terry v. Ohio,* 392 U.S. at 30 88 S.Ct. 1868). Reasonable suspicion is "a particularized and objective basis" for suspecting the person stopped of criminal activity. *United States v. Cortez,* 449 U.S. 411, 417–418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). When the officer has stopped a person based on reasonable suspicion of criminal activity, the officer may briefly detain the individual "in order to determine his identity or to maintain the status quo momentarily while obtaining more information." *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

■ The burden rests with the government to prove the reasonableness of the officer's suspicion. *United States v. Salzano,* 158 F.3d 1107, 1111 (10th Cir.1998). "A variety of factors may contribute to the formation of an objectively reasonable suspicion of illegal activity." *United States v. Hunnicutt,* 135 F.3d 1345, 1349 (10th Cir. 1998). "The law does not specify a minimum of factors necessary to constitute reasonable suspicion." *United States v. Gutierrez–Daniez,* 131 F.3d 939, 942 (10th Cir.1997) (citation omitted), *cert. denied,* 523 U.S. 1035, 118 S.Ct. 1334, 140 L.Ed.2d 494 (1998). Arriving at reasonable suspicion is a process dealing with probabilities, not hard certainties, " 'as understood by those versed in the field of law enforcement.'" *United States v. Gutierrez–Daniez,* 131 F.3d at 942 (quoting *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). Instead of closing

their eyes to suspicious circumstances, officers may call on their own experience and training to judge facts and even "perceive meaning in actions that appear innocuous to the untrained observer." *United States v. Gutierrez–Daniez,* 131 F.3d at 942 (citation omitted). On the other hand, "[i]nchoate suspicions and unparticularized hunches ... do not provide reasonable suspicion." *United States v. Salzano,* 158 F.3d at 1111 (quotation omitted). "While the necessary level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence, the Fourth Amendment requires some minimal level of objective justification." *United States v. Gutierrez–Daniez,* 131 F.3d at 942 (quotation omitted).

■ The court "judge[s] the officer's conduct in light of common sense and ordinary human experience." *United States v. Mendez,* 118 F.3d 1426, 1431 (10th Cir. 1997) (citation omitted). "This approach is intended to avoid unrealistic second-guessing of police officers' decisions and to accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. Gutierrez–Daniez,* 131 F.3d at 941 (quotation omitted). Rather than pigeonholing each fact as either innocuous or suspicious, we look at the totality of the circumstances in determining whether reasonable suspicion justified a longer detention. *United States v. Mendez,* 118 F.3d at 1431.

■ The government has carried its burden of proving that Trooper Epperly reasonably suspected the defendant of criminal activity based on the totality of circumstances. It was certainly reasonable to infer that the defendant took exit 138 in order to avoid what he believed was a drug checkpoint lane ahead. The strength of this inference is supported by several circumstances unique to this case.

First, exit 138 offered no services and there were no signs indicating the availability of such services or describing the exit as an alternative route to any major highway or larger population center. Second, exit 138 was used principally by local traffic. Third, driving a vehicle with an out-of-state license plate, the defendant had few legitimate reasons for taking exit 138. Fourth, the defendant voluntarily offered his reason for exiting, a low and "wobbly" tire needing repair. This reason seemed pretextual to Trooper Epperly, as the tire appeared to have nothing wrong with it and the exit did not offer any advertised services. Just eight miles back, the defendant had passed the Emporia exit which advertised all the services needed to address a tire problem. Because Trooper Epperly's patrol car apparently was not visible to an exiting vehicle until it nearly reached the end of the exit ramp, an officer in these circumstances could reasonably infer that the defendant contrived this reason for exiting to keep the officer from suspecting the defendant of the more obvious reason for exiting-to avoid the drug checkpoint. The defendant acted unusually nervous for someone who had approached a state trooper ostensibly to ask for help. The defendant was traveling an interstate highway known to be a drug corridor and from a known source state for drugs. Thus, Trooper Epperly had individualized reasonable suspicion of illegal activity when he asked for the defendant's license and proof of insurance and took the paperwork back to his patrol car to run the necessary checks.

■ The defendant next challenges the use of the drug detection dog on his pickup while the license checks were being performed. The defendant argues the dog sniff is a search requiring probable cause citing the Illinois decision of *People v. Caballes*, 207 Ill.2d 504, 280 Ill.Dec. 277, 802 N.E.2d 202 (2003), with certiorari granted by the Supreme Court, *Illinois v.*

*Caballes,* —— U.S. ——, 124 S.Ct. 1875, 158 L.Ed.2d 466 (2004). Until the Supreme Court rules otherwise, the law controlling in this circuit is that reasonable suspicion is sufficient to detain a person for purpose of performing a canine drug search, *United States v. Williams,* 271 F.3d 1262, 1271 (10th Cir.2001), *cert. denied,* 535 U.S. 1019, 122 S.Ct. 1610, 152 L.Ed.2d 624 (2002), and that a canine sniff is generally not a search within the meaning of the Fourth Amendment, *United States v. Brown,* 24 F.3d 1223, 1225 (10th Cir.1994); *United States v. Cervine,* 169 F.Supp.2d 1204, 1216 n. 1 (D.Kan.2001), *aff'd,* 347 F.3d 865 (10th Cir.2003). The court also notes that unlike *Caballes* the detention here resulted not from a traffic stop but from reasonable suspicion of illegal drug trafficking activity.

■ Tenth Circuit law clearly recognizes that the smell of drugs detected by experienced, certified and trained police and drug detection dogs, provides an officer with probable cause to search a vehicle. *See United States v. Souza,* 223 F.3d 1197, 1206 (10th Cir.2000) ("the box was alerted to by a certified narcotics dog, which is itself sufficient to create probable cause"); *United States v. Blaze,* 143 F.3d 585, 592 (10th Cir.1998) (stating that "[o]nce a dog alerts to a container, probable cause exists to open and search it"); *United States v. Ludwig,* 10 F.3d 1523, 1527–28 (10th Cir.1993) (holding that a dog alert to the trunk of a car by itself constitutes probable cause to search the trunk). The testimony of Deputy Doudican and the video recording of the deputy's statements show that he understood his dog, Sarge, to have alerted aggressively at the rear of the truck. That the dog's positive alert at the rear of the pickup was not seen on the video recording nor seen by Trooper Epperly and that drugs were found only in the truck cab are not facts sufficient for

this court to doubt that Trooper Epperly had probable cause to search the truck based on Deputy Doudican's representation to him. Nor does this court have cause to question Deputy Doudican's credibility in that regard. The truck cab was found to contain a warm methamphetamine pipe and the window on the driver's side was rolled down. The video recording shows that the branches on the tree near the pickup were being moved slightly by a breeze in a direction that would not be inconsistent with the drug dog's detection of an odor at the rear of the pickup that would be emanating from the cab. The defendant's motion to suppress is denied.

## MOTION FOR DISCOVERY RELATED TO DRUG DETECTION DOG (Dk.20)

Beyond the training and certification records for the drug detection dog handled by Lyon County Sheriff's Department Deputy Doudigan, the defendant moves for a variety of other information about the dog. Citing Fed.R.Crim.P. 16 and *Brady v. Maryland,* the defendant argues this information is essential in preparing an effective defense because the dog's alert was used to justify the search and because the alert was not visible on the videotape. The government opposes the motion as a broad and unlimited discovery request unsupported by a showing of materiality and based on nothing more than conclusory allegations.

 The defendant has not met his burden of making a prima facie showing of materiality for any information other than the training and certification records for the year prior to the date of the search. In proving probable cause to search the defendant's pickup, the government must prove that the dog was trained and certified at the time of the alert. Absent an additional showing of materiality, the defendant is not entitled to anything more:

Both Tenth Circuit and Fifth Circuit precedent recognize that a probable cause showing must at a minimum prove that the dog is trained and currently certified. There may be circumstances where a more complete investigation is required, because the reliability presumed from certification and training is subject to question. These may include that the dog's training or certification was substandard, that the health of the dog was such as to possibly affect reliability, and that the circumstances of the particular search raise issues regarding the dog's reliability.

*United States v. Wood,* 915 F.Supp. 1126, 1136 (D.Kan.1996), *rev'd on other grounds,* 106 F.3d 942 (10th Cir.1997); *see, e.g., United States v. Robertson,* 2004 WL 1846137 at *1 (D.Kan. Jun.2, 2004). The testimony of Deputy Doudican, absent any records to impeach or refute the same, establishes that his dog met the training and certification requirements. The court will permit the defendant to review those training and certification records for the last year. The defendant's motion offers no substantial grounds for additional information concerning the drug detection dog. Thus, the defendant's motion for discovery is granted insofar as the government shall make available to the defendant the training records and certifications for the year prior to the search and is denied in all other respects.

## MOTION TO SUPPRESS STATEMENT (Dk.21).

The defendant argues that his statements on August 6, 2004, were not voluntary because officers questioned him while he apparently was under the influence of methamphetamine. During the search of the truck cab, Trooper Epperly found a methamphetamine pipe that was warm to the touch. Trooper Epperly later administered a Miranda warning and proceeded to

question the defendant confirming that the defendant had recently used methamphetamine.

The law does not support the defendant's broad argument that the defendant's state of intoxication and the officer's knowledge of the same prevents a finding that defendant's statement was voluntary. The Tenth Circuit has summarized the relevant law in this way:

> If "mental impairment ... should have reasonably been apparent to ... interrogators," then "a lesser quantum of coercion [will] render the confession involuntary." *United States v. Sablotny,* 21 F.3d 747, 752 (7th Cir.1994); *see also Williams v. Collins,* 16 F.3d 626, 638 (5th Cir.) (noting as relevant to the petitioner's claim that his confession to police was involuntary, due to police coercion and to his "diminished capacity," that neither the police officers, who were experienced in detecting drug or alcohol usage, nor the petitioner's father, "testified that [the petitioner] appeared to be impaired in any way"), *cert. denied,* 512 U.S. 1289, 115 S.Ct. 42, 129 L.Ed.2d 937 (1994). However, even in such cases, for a confession to be involuntary, "the police must somehow overreach by exploiting a weakness or condition known to exist." *United States v. Robertson,* 19 F.3d 1318, 1321 (10th Cir.), *cert. denied,* 513 U.S. 906, 115 S.Ct. 271, 130 L.Ed.2d 189 (1994); *see also United States v. Guerro,* 983 F.2d 1001, 1004 (10th Cir. 1993) (same).

*Nickel v. Hannigan,* 97 F.3d 403, 410 (10th Cir.1996), *cert. denied,* 520 U.S. 1106, 117 S.Ct. 1112, 137 L.Ed.2d 313 (1997). "We note that a state of intoxication does not automatically render a statement involuntary." *United States v. McCullah,* 76 F.3d 1087, 1101 n. 3 (10th Cir.1996) (citation omitted), *cert. denied,* 520 U.S. 1213, 117 S.Ct. 1699, 137 L.Ed.2d 825 (1997). Coercive police activity remains a necessary predicate to a finding that a confession is not voluntary within the meaning of the due process clause. *See Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

The government has come forth with sufficient evidence to establish that the agents were not overreaching and did not exploit the defendant's physical or mental condition with coercive tactics. Although there is evidence that prior to the questioning the defendant had used methamphetamine and the officers knew this, the video recording shows the defendant had no difficulty walking or communicating. He demonstrated an ability to understand the questions, appeared alert and coherent, and oriented to time and place. There is no evidence that trickery or deception was used in the questioning of the defendant. The defendant does not explain how the trooper's actions were taken in such a way as to exploit his intoxicated state. The record does not show that the defendant was asked complicated or trick questions or was subjected to lengthy and uninterrupted interrogation. The trooper described the defendant as coherent and in control of himself. The trooper did not recall any improper or strange responses. The videotape shows the defendant conducted himself in a lucid and rationale manner and did not appear susceptible to his will being overborne by standard questioning. The defendant provided complete and detailed information in response to several questions. The court is satisfied from the evidence that the defendant's ability and capacity to make voluntary statements was not so impaired that typical non-coercive questioning would produce involuntary responses. *See Elliott v. Williams,* 248 F.3d 1205 (10th Cir.) (affirming court's determination that statement by defendant who had taken heroin was voluntary and admissible), *cert. denied,* 534 U.S. 927, 122 S.Ct. 286, 151

L.Ed.2d 211 (2001). The government has met its burden to show that defendant's statements were the product of free and deliberate choice rather than intimidation, coercion, or deception.

IT IS THEREFORE ORDERED that the defendant's Motion to Suppress Evidence and Statements (Dk.19) is denied;

IT IS FURTHER ORDERED that the defendant's Motion for Discovery Related to Drug Detection Dog (Dk.20) is granted insofar as the government shall make available to the defendant the training records and certifications for the year prior to the search and is denied in all other respects;

IT IS FURTHER ORDERED that the defendant's Motion to Suppress Statement (Dk.21) is denied.